I am your honor. Good morning. Good morning. And Mr. DeBruin, you're on the line. Yes, your honor. Thank you. Mr. DeBruin is here. All right, Mr. Tanner, you can proceed. Thank you, your honors. And may please forward on behalf of the defendant with the Union Springs and to try to put some context to what's going on in the state of California. On my comments here, we know from Cheryl that when a tribe refuses to pay real property taxes that are owed, that is deemed to be inherently disruptive to settled expectations of the non-Indian community. We also know from Cheryl, dropping a footnote to the Village of Union Springs pending case at the time, that when a tribe refuses to comply with zoning and land use laws, that's even more disruptive to settled expectations because it impacts the broader community. And now we know that from the way things have happened in Central New York, that when the tribe is enforcing its own conception, residual sovereignty over the land, in derogation of Cheryl's clear mandate that long absent tribes do not have any sovereignty, their ancient sovereignty has long grown cold, and they exercise no sovereign authority over the fee lands within their ancient reservation boundaries. None. Mr. Tennant, excuse me, this is Judge Lynch. I understand all of those points, but I'm having a little trouble understanding what they have to do with this challenge. Because this challenge is about, I take it that the tribe's position here is that your gambling prohibition in the town is preempted by the IGRA. Is that not right? Well, that is a contention that then… And I mean, they may be wrong about that. I mean, that's a whole separate question. But all of the Cheryl arguments have to do with whether the tribe is exempt from various forms of regulation that don't necessarily have to do with gambling. And that's corrected in the sense of the evolution of Cheryl. We do know that at its core, it is a zero-sum derogation of state and county local sovereignty. Yes, but it's one that is the product of congressional action, if it exists. But what they're arguing for is a consequence of what they claim is Congress's decision to preempt local law enforcement in regard to certain matters of gambling within the boundaries of a reservation. So I understand all the points you're making about Cheryl, but this seems to me somewhat more akin to McGirt, where I noticed in rereading that opinion that the Supreme Court didn't mention Cheryl as having anything to do with the situation there. Well, let me address McGirt first, just in terms of a decision that has to be read in terms of the Oklahoma bi-civilized tribes there and their unique history that has nothing at all whatsoever to do with the history of New York Indians. And the New York Indians who have been long absent from their historic reservations can come back and do disruptive things. And a disruptive thing can include violating village zoning and land use laws that are otherwise applicable laws of general application to Indians and non-Indians everywhere. Well, excuse me, Mr. Kent, can you help me with that? Because I thought that the particular regulation at issue here, to the extent it's a land use regulation, you're saying they need a variance. But isn't the problem that they can't get a variance and that the reason they would even need one is not because of something that says you can gamble on this street, but not on that street, but is an absolute prohibition on gambling. It's all a gambling-specific situation. It's not about industrial zones versus residential zones or anything of that sort, is it, or am I mistaken? Well, the Gaming Ordinance in question, passed in 1958, allows for non-profit use of bingo and other things to basically generate, on an occasional basis, money for fire departments and other local institutions. Right, exactly. But that's exactly the kind of regulation that on reservations, Congress has said is not going to apply. And Congress says that it's going to have, or the Indian gambling, they use this funny word and I can't bring myself to remember it, the Indian Gaming Regulatory Authority or whatever makes these decisions, not the localities. So I'm still having trouble understanding why this is about zoning or land use or why it's about the same kind of broad exemption from local authority that the tribe claimed in Sherrill, rather than just a straight-up issue that you have. And I'm sorry I'm taking up so much of your time, but it's because you're taking up your time talking about things other than what the statute means that is the basis for the tribe's claim. that is so at odds with disrupting settled expectations. And our position is that the long, these ancient reservations that have not officially been established, but over which the tribes exercise no inherent sovereignty, in whole or in part, post-Sherrill, cannot fit within the IGRA. Mr. Tennant, why isn't the zoning ordinance preempted by IGRA? Well, the zoning ordinance itself is not on its face, an anti-gaming ordinance, and the tribe is simply wrong when they say that if they went to the town to comply with the zoning. To the extent that the town is trying to use it to stop the nation from operating a gaming facility, it does apply, right? Why isn't it preempted? I mean, if you just look at the words of the statute, on Indian lands, all lands within the limits of any Indian reservation, it would seem that Lakeside is on Indian lands. Well, we have to go back to some first principles of how to decide whether Lakeside Entertainment is on Indian lands. When it's on sea lands, they're under the 100% jurisdiction of New York State and political subdivisions. How can it be that? And as we point out, it's not a simple plain reading of the statute when you have lands that the tribe doesn't have the right to exercise governmental power over it and to actually do the things that tribes actually have meant to do. Yeah, but again, Mr. Tennant, it's not what the Indians have a right to do. It's what the federal government has a right to do. Under the statute, Congress has arrogated to itself the regulation and to its agencies the regulation of this kind of gaming, quote, on land within an Indian reservation. And everyone agrees that however notional it may seem, the land in question is on an Indian reservation that has never been disestablished. Now, the agency doesn't have to allow them to do this. There's even an argument that it shouldn't allow them to do this. And maybe you can get the agency to revoke its permit or even to judicially challenge the permit that the agency gave to the tribe. That's a separate kind of question. But the issue here isn't that they have an absolute right under a treaty or something to open this bingo parlor. The question is who decides and it's you or Congress or you or the agency to whom Congress, they argue, has delegated the power to regulate gambling within the limits of an Indian reservation. Isn't that really the question? Well, the question, in our view, is really the only way that you can reconcile Sherrill and IGRA and the body of law that says that the villages zoning and land use laws remain completely in effect is to say the land must be taken into trust. That's the proper avenue that Sherrill's stating. So that's what Sherrill said was the case when the tribe tries to exercise this sweeping total exemption from local regulation and this sweeping jurisdiction that was claimed in Sherrill. But what's claimed here is something much more modest than what was at issue in Sherrill and much more modest, for heaven's sake, than what was at issue in McGirt. the ability to open a casino using a permit that was issued to it by a federal agency, which then conducts inspections and apparently thinks that it has the power to permit or not permit this activity. I mean, that's the problem that I have with your argument. What am I missing? Well, I think what's missing is that with the limited involvement of the NIGC, where for so many years they were taking the position that the tribe can't engage in Indian gaming on these lands because they don't have governmental power over them. And that has been the position, not just of the NIGC, but certainly of the state of New York and its political subdivisions. All right, Mr. Tennant, you're well over your time. You have two minutes for rebuttal. Let's hear from Mr. DeBruin. Thank you, Your Honor. May it please the court, David DeBruin for the Cayuga Nation. I also would like to start with the merits and make three points. First, contrary to the merits argument the village is making on appeal, the Cayuga Nation's gaming clearly occurs, quote, on Indian lands. The IGRA is clear that Indian lands includes all lands within the limits of any Indian reservation. We know what a reservation is, as McGirt made clear just last year. The village, in fact, has stipulated that the Cayuga reservation still exists. The word reservation is used in countless federal statutes, and there's no basis to conclude that reservation means something different under the IGRA than other federal statutes. Indeed, the village's attempt to overlay a governmental power requirement is inconsistent with the structure of IGRA, which expressly imposes that requirement for trust lands, but not for reservation lands. Second, as this court held in the Mashantucket case, IGRA was intended to expressly preempt the field in the governance of gaming activities on Indian lands. And third, and this is the point I think your questions to Mr. Tennant were addressing, the lawfulness of gaming on Indian lands, which requires that Indian lands be within such tribes' jurisdiction, an issue the village is not raising on this appeal, can be raised only as a challenge under Section 2714 of the IGRA to a decision of the NIGC regulating gaming as the NIGC is doing here and as the village acknowledges. Mr. DeVernier, can I just follow up on that just to make sure that I understand this correctly? Am I correct, first of all, that the Cayuga Nation has a permit from the NIGA? The NIGC has issued a letter to the Nation that it is fully regulating the Nation's gaming activities. And what that means, among other things, it receives revenues from the Nation. In other words, the Nation shares a portion of its gaming revenues with the NIGC. The NIGC receives those payments, cashes those checks. The NIGC issues licenses for the individuals who conduct, who oversee the gaming on the site. Each of those persons have to be fingerprinted. Their backgrounds are checked and the NIGC issues a specific license. Okay, so in short then, Mr. DeVernier, what you're telling me is maybe the word permit isn't technically the right word, but the NIGC is engaged actively in regulating this facility. That is, I believe, undisputed by the, yes, and I believe it's undisputed by the village. And again, the village has a mechanism to challenge that. And let me, that's sort of the next question. I take it that the NIGC has the power, whether it would be rightfully exercised or not, or it would depend on the circumstances, they would have the power to shut you down, would it not? It would under Section 2713 of the IGRA. It has enforcement capability to both issue fines and to seek to shut us down temporarily or permanently. Okay, so if you're doing something that violates the federal law and the federal regulations, there would be consequences which could potentially include closing you down. Correct. And does the village have a, you may have heard an argument or a question similar to this in the last argument. You say that the way for the village to challenge the legality of what the commission is doing is by seeking some judicial review of some sort of action on their part. Are you now going to turn around and tell me that, but of course they've waived that because the time to do that was when they first sent that letter or when the village first became aware of that letter? Or is that some lawsuit that is still available to the village? Your Honor, that would be an issue decided under the Administrative Procedure Act. I will be honest, I have not looked at the requirements of whether and when the village could bring such a challenge under the Administrative Procedure Act. But let me point out, Your Honor, more significantly, the village has been aware since the Union Springs 1 litigation that this was the avenue. They argued, and I would direct you to the appendix page 1011, where the village argued before Judge Heard, and this is back in the Union Springs 1 litigation, and I quote, The determination whether the Napa parcel is Indian land under IGRA is a determination to be made by the Department of the Interior. While any determination by the Department of Interior would be reviewable by a federal district court under 25 U.S.C. 2714, the initial determination must be made by the Department of Interior. So the village has known since that filing back in, I believe it was 2014, that it had the recourse of seeking review of a decision by the NIGC. Yes, Mr. Debrin, that's kind of the way that you were aware from the very beginning of the first round of this dispute that your plan was to open a casino, and that arguably one argument that you could have raised as to why they shouldn't be messing with you is because their goals here were preempted by IGRA. But it's clear, Your Honor, we had no obligation to bring that claim because at that point in time, the village, even when it was making the argument that we were gaming and that we needed approval from the NIGC, the village never invoked, cited, or raised its anti-gaming ordinance. The early litigation was specifically about building and construction. If you look at Appendix A-958, what we had been cited for was no demolition permit, no asbestos survey, no stamp plans by architect, engineer, no building permit. That is what we were challenging in the original litigation underground that were very different. We had no obligation at that time, not having been cited with any village anti-gaming ordinance, to challenge things that the village had not yet invoked against us. Indeed, there's a question as to whether we could at that point. We were not gaming when we brought the complaint. We didn't have a gaming ordinance. That gaming ordinance hadn't been approved by the NIGC. So the issue of gaming, and more importantly, would not even have been determinative as to whether the zoning, the building construction regulations would apply. As this court made clear in the Mashantucket case, IGRA preempts the field of the governance of gaming activities. Whether or not that would have anything to do with construction, safety, fire, those kind of requirements is a very different question. That was the question at issue in the original litigation. But my point is, Your Honor, as to the village's ability to challenge the regulation of our gaming by the NIGC, that always has been clear and the village has made the argument itself. The proper way to do that is under Section 2714 and the Administrative Procedure Act. It is not for the village independently to invoke its own local law prohibiting gaming. The field has been preempted and Congress has occupied that field and imposed regulatory authority over gaming on Indian lands with the NIGC. The NIGC is exercising that authority and that really resolves the question in this case. You have one minute. Just in closing, I would underscore, as the court has noted, this case, frankly, is just like McGirt. There, the Major Crimes Act preempted state prosecutions of certain major crimes in, quote, Indian Crete, which is defined by federal law to include all lands within the limits of any Indian reservation, just like the statute here. The Supreme Court was urged in McGirt to, quote, acknowledge that de facto, close quote, the Crete Nation's lands were no longer a reservation, just as the village in its brief here contends that the Cayuga Reservation is a, quote, de facto former reservation, and that's at page 44 of their opening brief. It's the same argument in this case that the Supreme Court rejected in McGirt, and there's no difference. The issue in McGirt was the same. The Crete Nation, in fact, had been absent for long periods of time from the city of Tulsa and many other portions of eastern Oklahoma. The notion that there is some exclusive jurisdiction, state or tribal and federal, was dispelled by McGirt. Clearly, the court held states have the right to prosecute individuals, non-Indians, for crimes in Indian Country, but not to prosecute major crimes committed by Indians in Indian Country. There, tribes, the Crete Nation, or the federal government has exclusive authority. So, within land, there can... Thank you. Thank you very much. We'll hear the rebuttal, Mr. Tenet. Thank you. And I would return to the issues of claim preclusion, in particular, the pre-enforcement challenge that was clearly available to the Cayugas here when, in 2003, as everyone knows, they were putting together all their plans to come out with their lakeside gaming plan. And they did. They executed on it, and they were at midstream when they sued prophylactically as a first strike to knock out all the laws, including the 1958 gaming ordinance that was on the books that they knew about at that time. And we have cited the Ninth Circuit case, Gospel Mission, which specifically sends claim preclusion to claims that could have and should have been brought. Well, the should have is the problem, isn't it? I mean, any claim that the nation had related or unrelated against the town for any reason could be joined, because under the federal rules, joinder is wide open. But that's not enough for claim preclusion. It has to be something arising from the same transaction, does it not? Well, when you're talking about the same transaction being identical in the sense of... But why is it identical? I'm looking at the stop work order that was issued that was challenged effectively in the first litigation, and it has a list of things that are wrong. Need stamped plans by architect engineer, need a building permit, demolition without a permit or asbestos survey are the reasons why the work at the building site was to be stopped. And there's a citation to specific provisions of the zoning ordinance. And the issue was whether that zoning ordinance does or does not apply to the Cayugas, right? But that was the zoning violations that were apparent manifest when the tribe was not telling anyone that it was actually building a gaming facility. So the village was limited to identifying those things that were out of law, that were inconsistent with village zoning and land use. We're saying that the Cayugas, at the moment they commence their plan in the village to open a gaming facility, which goes back to suing other tribes to keep them out of the area. So it was only for the Cayugas of New York to pursue, and that they undertook specifically plans to open a gaming facility. Right, but suppose they had complied with all the building regulations. You're saying that then they somehow should have taken affirmative action to sue about the gambling issue? Absolutely, just like the owner of the Tweed New Haven Airport who says, you know, I want to extend my runway, but the law says I can't do this. The tribe wanted to engage in gaming, and they knew that there was a village anti-gaming ordinance that stood in their way. So you're saying this is independent of the fact that they did bring a litigation. They somehow lost their chance to make the claim that they're making now because they did not sue preemptively to invalidate the local gambling ordinance under IGRA. Yes, I mean, they absolutely had the opportunity and the obligation, knowing what their plan of action was and what they proved to actually put into play, and that they had, in light of their already commenced action challenging the zoning and land use, they could and should have raised at that moment the pre-enforcement challenge to the zoning, to the anti-gaming ordinance. All right, thank you. And we wouldn't be here today if they had. Thank you both. The court will reserve decision. We'll move on to the next.